IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | Case No. 2:06-cr-03 |
| v. | : | Judge Holschuh |
| MICHAEL L. TUCKER, | : | |
| Defendant. | : | |
| | : | |

**MEMORANDUM OPINION AND ORDER**

On January 5, 2006, Defendant was indicted on: one count of possession with intent to distribute in excess of 50 grams of cocaine base (i.e., crack cocaine) in violation of 21 U.S.C. §§ 841(a)(1); one count of possession of a firearm in furtherance of a drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i); and one count of possession of ammunition by a convicted felon in violation of 18 U.S.C. § 922(g)(1).[1]  This matter is before the Court on Defendant's motion to suppress evidence.  (Doc. # 21).  A suppression hearing was held on March 27, 2006.

**I. Background**

On December 7, 2005, Columbus Police Officers Hannah and Baase were on routine patrol when they observed Defendant commit a traffic violation.  The Officers activated their emergency lights and siren to signal Defendant to pull over.  Defendant, however, fled from the Officers at a high rate of speed and attempted to elude the Officers.  Eventually, Defendant crashed his vehicle into a building and fled on foot.

---

[1]Additionally, the indictment contains a forfeiture count under 18 U.S.C. § 924(d)(1).

Officer Hannah secured the vehicle and did not observe any other occupants in the vehicle. Officer Hannah did, however, observe a loaded pistol in plain view on the passenger seat of the vehicle. Additionally, while conducting an inventory search of the vehicle, Officer Hannah discovered approximately 106 grams of what was suspected to be crack cocaine.

In the meantime, Officer Baase pursued Defendant on foot. Officer Baase was joined in the pursuit by several other Columbus Police Officers. Defendant was eventually apprehended by Officers Pettengill and Wilson of the Columbus Police Department and was transported back to the scene of the accident.

Because suspected drugs and a loaded weapon were recovered, Detective Michael Malloy of the Columbus Police Department was called to the scene. When Detective Malloy arrived on the scene, he was told that Defendant wanted to talk to him. Although Detective Malloy does not recall the specifics of his conversation with Defendant, he was aware that Defendant was interested in cooperating with law enforcement. In particular, Defendant apparently suggested that, in exchange for his cooperation, he be ticketed for a traffic violation and released. Detective Malloy does not recall his response to Defendant's suggestion. At no point during this discussion was Defendant informed of his <u>Miranda</u> rights.

Defendant was then transported to Columbus Police Headquarters and placed in an interview room by himself. After an interval of approximately 22 minutes, Special Agents Timothy Burt and Ryan McBride of the Federal Bureau of Alcohol, Tobacco, and Firearms, along with Officer Smith Weir of the Columbus Police Department entered the room to interrogate Defendant. Defendant immediately asked for Detective Malloy. Detective Malloy then joined the interrogation.

Special Agent Burt began the interrogation of Defendant with a somewhat cursory reference to Defendant's Miranda rights:[2]

**Burt:** You been arrested before, haven't you ... unintelligible ... you know you have the same rights, we're going to go through them the same way ... you want to figure out what's going on here?

**Tucker:** Yeah.

**Burt:** Figured you did ... we want to, too.

**Malloy:** unintelligible.

**Burt:** I just want to run through this real quick. You understand your right ... you've been arrested before, you understand your right to remain silent, all that ... unintelligible ... you want to stop at any time you just tell us. Alright ... does that make sense to you? You've been arrested multiple times, you've gone through this multiple times. Before we can go through and talk to you we have to go through this ... okay? You get sick of talking to us, don't want to say any more ... you just say so ... okay?

**Burt:** I'm going to have you ...

**Tucker:** unintelligible ... I already said I'm want to talk.

**Burt:** ... sign right there saying you understand what your rights are, you're willing to waive them and you're willing to talk to us and we'll figure this thing out.

**Malloy:** How many times have you had your rights read to you?

---

[2]Agent Burt had spent the day on duty in eastern Ohio and had been summoned to come to Columbus Police Headquarters when he was on his way home that night. He was unhappy that his return home was interrupted, but agreed to assist and proceeded to the Headquarters where Defendant was being held in custody.

| | |
|---|---|
| **Tucker:** | Shit, I was ... me and him just now, I mean aloud? |
| **Malloy:** | Yeah, I mean, more than once ... a half a dozen? |
| **Tucker:** | Yeah. |
| **Burt:** | Ah, we can go through every line if you want. |
| **Tucker:** | No, I'm alright. |
| **Burt:** | Okay. |

(Government's Exhibit 3A, at p. 1).

Thereafter, Defendant made various inculpatory statements. Additionally, during the interrogation, the subject of cooperation was discussed. Defendant apparently believed that there was an understanding with Detective Malloy that, if Defendant cooperated, he would be released with a traffic ticket. However, Detective Malloy told Defendant, after Defendant had signed a written waiver of his Miranda rights and had given inculpatory statements, that he had not made any promise to release Defendant with a traffic ticket in exchange for Defendant's cooperation. Defendant, in response, acknowledged that Detective Malloy had not made any specific promise as such.

## II. Discussion

### A. Miranda

Defendant has moved to suppress the statements made during the December 7, 2005 interrogation, as well as the video recording of that interrogation. The Fifth Amendment guarantees that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court extended the Fifth Amendment privilege against compulsory self-incrimination to individuals subjected to custodial

4

interrogation by the police.  Miranda, 384 U.S. at 460-61.  Although the Fifth Amendment does not prohibit all incriminating admissions, the Supreme Court noted that interrogation in certain custodial circumstances is inherently coercive and thus statements made under such circumstances are inadmissible unless: (1) the suspect is specifically informed of his rights, and (2) freely decides to forgo those rights.  See New York v. Quarles, 467 U.S. 649, 654 (1984).  In particular, the Miranda Court summarized that:

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.  By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way....  As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required.  Prior to any questioning, the person must be warned that he has a right to remain silent, that any statements he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.  The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.

Miranda, 384 U.S. at 444-45 (footnote omitted).

   **B. Application**

   **1. Defendant was not Informed of His Miranda Rights**

There is no question that Defendant was subjected to a custodial interrogation, and it is undisputed that neither Agent Burt nor Detective Malloy read the Miranda rights to Defendant before they began their interrogation of Defendant.  Instead, the approach was to repeatedly remind Defendant of his previous arrests and to then tell him to sign a waiver of his Miranda

rights. It is very clear, however, that the fact that Defendant had been previously arrested is insufficient to establish that Defendant was aware of his Miranda rights. See United States v. Espinosa-Orlando, 704 F.2d 507, 514 (11th Cir. 1983) (quoting Miranda, 384 U.S. at 471-72 ("No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead")). In fact, the Supreme Court has specifically held that "[a]ssessments of the knowledge the defendant possessed, based on ... prior contact with authorities, can never be more than speculation...." Miranda, 384 U.S. at 468-69. "[W]hatever the background of the person interrogated, a warning at the time of the interrogation is indispensable to overcome its pressures and to insure that the individual knows he is free to exercise the privilege at that point in time." Id. at 469.

### 2. Defendant did not Validly Waive His Miranda Rights

Miranda makes it clear that "the defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444 (emphasis added). The burden is on the Government to show, by a preponderance of the evidence, that Defendant validly waived his Miranda rights. Colorado v. Connelly, 479 U.S. 157, 168 (1986). The Supreme Court has noted that there is a presumption that a defendant did not waive his rights, and the prosecution's burden of rebutting that presumption "is great." North Carolina v. Butler, 441 U.S. 369, 373 (1979).[3]

In determining whether Defendant validly waived his rights, a court should consider whether: (1) the relinquishment of the right was voluntary in the sense that it was the product of

---

[3]The Supreme Court acknowledged that at least in "some cases" waiver can be clearly inferred from the actions and words of the person interrogated. For the reasons hereafter stated, the present case is not one of those cases.

free and deliberate choice rather than intimidation, coercion or deception; and (2) the waiver was made with full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Machacek v. Hofbauer, 213 F.3d 947, 954 (6th Cir. 2000); United States v. Mayhew, 380 F. Supp.2d 915, 921-22 (S.D. Ohio 2005)(citations omitted). Only if the "totality of the circumstances surrounding the investigation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived. Machacek, 213 F.3d at 954 (citations omitted); Mayhew, 380 F. Supp.2d at 922 (citations omitted).

There is no dispute that Defendant signed a written waiver of his Miranda rights. Defendant argues, however, that his waiver was not voluntary because it was based on a perceived agreement with Detective Malloy that, if Defendant cooperated, Defendant would be released with only a traffic ticket. The Government contends that no law enforcement officer made any promise to Defendant, and that it was Defendant himself who suggested the issuance of a traffic ticket in exchange for cooperation.

"[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." Miranda, 384 U.S. at 476. In support of his position, Defendant cites Lynumn v. Illinois, 372 U.S. 528 (1963). In that case, police officers told petitioner that state financial aid for her infant children would be cut off and her children taken away if she did not cooperate. The Supreme Court held that petitioner's confession was coerced and, therefore, not voluntary. Lynumn, 372 U.S. at 920. Defendant also cites several cases in which promises of leniency were held to be sufficiently coercive.

7

(Defendant's Motion to Suppress, at p. 7 (citations omitted)).[4]

The facts of this case are clearly distinguishable from Lynumn. Additionally, although the Sixth Circuit has recognized that "promises of leniency and threats of prosecution can be objectively coercive," see United States v. Johnson, 351 F.3d 254, 261 (6th Cir. 2003), this does not appear to be a case in which the evidence would show that Defendant was threatened or that a specific offer of leniency was actually made.

Although the Court is satisfied that there were no threats or specific promises of leniency made in order to obtain Defendant's waiver of his Miranda rights, the manner in which that waiver was obtained is very troubling. Agent Burt, displeased that he had been called to Police Headquarters after a full day of investigation in eastern Ohio, started his questioning of Defendant by noting that Defendant had been arrested before and that he has "the same rights." Agent Burt also asked Defendant whether he wanted to "figure out what's going on here?" (Government's Exhibit 3A, at p. 1(emphasis added)). When Defendant answered "yeah," *i.e.*, yes, he wanted to know what is going on in his case, Agent Burt responded, "figured you did ... we want to, too." (Id.). It was then that Agent Burt said that, with respect to Defendant's Miranda rights, he wanted to "run through this real quick." (Id.). He then told Defendant, the second time that "you've been arrested before," a third time that "you've been arrested multiple times," and a fourth time that "you've gone through this multiple times." (Id.). With respect to the written waiver, Agent Burt said, "sign right there saying you understand what your rights are, you're willing to waive them and you're willing to talk to us and we'll figure this thing out."

---

[4]The Government, on the other hand, cites cases in which promises of leniency did not invalidate a subsequent confession. (Government's Memorandum Contra, at p. 10 (citations omitted)).

(Id. at p. 2 (emphasis added)).

The Supreme Court in Miranda explicitly said that any evidence that the accused was cajoled into a waiver "will, of course, show that the defendant did not voluntarily waive his privilege." Miranda, 384 U.S. at 476.  This Court is of the opinion that the present case is a classic case of an accused being cajoled or coaxed into signing a Miranda waiver.  By repeatedly telling Defendant of his prior arrests and that he had "gone through [his Miranda rights] multiple times," he essentially was telling Defendant that, because Defendant presumably had heard his rights in the past, it really was not necessary to go through a recitation of those rights again– just sign the waiver and we can "figure out what's going on here."

A waiver that results from coaxing a defendant to sign because the defendant is repeatedly told that he already knows his Miranda rights and that if he signs he will receive something of value, *i.e.*, "to figure out what's going on here," is not, as the Sixth Circuit has required, "the product of free and deliberate choice." Machacek, 213 F.3d at 954 (citations omitted).  It is, instead, an improper coaxing, cajoling, and/or inducement by a law enforcement officer to persuade a defendant to give up his right to the warnings mandated by the Supreme Court in Miranda.  The Court concludes, therefore, that the waiver at issue in this case was not a voluntary waiver.

There is also a question of whether the waiver, even if it were a voluntary waiver, could be considered a waiver that was made with an understanding of the consequences of the waiver or whether – under the unique circumstances of this case – the waiver resulted from a belief that, based on an earlier conversation with one of the interrogators, Defendant would be released if he cooperated with his interrogators.

9

The Government bears the burden of establishing that Defendant knowingly and intelligently waived his Miranda rights. As was discussed *supra*, Defendant was not read his Miranda rights. After telling Defendant that he had the right to remain silent and the right to end the interrogation, and after repeatedly telling Defendant that he had been arrested on numerous occasions and already knew his rights, Agent Burt simply pushed a printed waiver form across the table to Defendant. He did not ask Defendant to read it. He asked Defendant to sign it. It is clear from the video that Defendant did not read the form before signing it.

The Government notes that when the waiver form was handed to Defendant, Agent Burt said, "before we can go through and talk to you we have to go through this...." The Government points out that Defendant responded: "I already said I'm want to talk." The Government also notes that Agent Burt offered to go over the waiver form line by line and that Defendant responded, "No, I'm alright."

These remarks must be considered in the context of all of the circumstances preceding the signing of the written waiver. Defendant's response that "I already said I'm want to talk" was an obvious reference to Defendant's belief that he had an understanding with Detective Malloy that if he talked, *i.e.*, gave information of value to law enforcement, he would be released with a traffic ticket. While there is some evidence to support that misconception, Defendant's remark that he wanted "to talk" has to be taken in context of the events surrounding Defendant's arrest and his conversation with Detective Malloy regarding Defendant's desire to assist law enforcement in return for being released that night with a traffic ticket.

The evidence supports a finding that Defendant's willingness to talk and his motive in signing the waiver without reading it was a hope or misplaced belief that, based on his earlier

10

conversation with Detective Malloy, he would be allowed to go home that night with only a traffic ticket. He refused to talk with Agent Burt until Detective Malloy came into the interrogation room. It is the Court's view that Detective Malloy, who now cannot recall what response he made to Defendant's request that he be released with a traffic ticket in exchange for his cooperation, had the responsibility to reject Defendant's request outright or to tell Defendant that he could not promise Defendant anything <u>before</u> Defendant signed the waiver. Instead, Detective Malloy remained silent until after the waiver had been signed and the interrogation virtually ended before he told Defendant he had not promised him anything. Similarly, Agent Burt's belated offer to go over the rights contained in the written waiver came <u>after</u> Defendant had, at Burt's request, signed the written waiver.

### III. Conclusion

As a result of the undisputed facts concerning the admitted failure of Defendant's interrogators to inform Defendant of his <u>Miranda</u> rights and the manner in which they obtained Defendant's signature on a printed waiver of rights form, the Court concludes that the Government has failed to sustain its burden of proving that Defendant voluntarily, knowingly and intelligently waived his constitutional rights as described in <u>Miranda</u>.

**WHEREUPON**, Defendant's motion to suppress (Doc. # 21) is **GRANTED**. The Court will suppress the statements made by Defendant in the course of the December 7, 2005 interrogation, as well as the video recording of that interrogation.

Pursuant to this Court's March 27, 2006 Order (Doc. # 26), a Conference Prior to Trial is scheduled for **Monday, May 22, 2006 at 2:00 p.m.** Trial is scheduled for **Tuesday, May 23, 2006 at 9:00 a.m.**

**IT IS SO ORDERED.**

April 28, 2006                                        /s/ John D. Holschuh
                                                                 John D. Holschuh, Judge
                                                                 United States District Court